**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DELEVINE MONELL,**

                                        **Plaintiff,**

         **vs.**                                                  **1:10-cv-897**
                                                                  **(MAD/RFT)**

**THE SCOOTER STORE, LTD and PRIDE**
**MOBILITY PRODUCTS CORPORATION,**

                                        **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**GOLDSTEIN & METZGER, LLC**              **PAUL J. GOLDSTEIN, ESQ.**
40 Garden Street
Poughkeepsie, New York 12601-3106
Attorneys for Plaintiff

**MIRANDA, SAMBURSKY, SLONE,**            **NEIL L. SAMBURSKY, ESQ.**
**SKLARIN & VERVENIOTIS, LLP**
240 Mineola Boulevard
Mineola, New York 11501
Attorneys for Defendants

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

        Plaintiff commenced this action on July 21, 2010.  *See* Dkt. No. 1.  On February 14, 2011,

Plaintiff amended her complaint, alleging causes of action against Defendants in negligence, strict

tort liability, and breach of express and implied warranties, "including but not limited to the

breach of implied warranties as to merchantability and fitness."  *See* Dkt. No. 20.  Currently

before the Court are Defendants' motions to exclude Plaintiff's expert and for summary judgment.

*See* Dkt. No. 31.

**II. BACKGROUND**

**A.      The scooter and accident at issue**

In March of 2010, Plaintiff was a ninety-three year old woman who had limited mobility. *See* Dkt. No. 31-11 at ¶¶ 3-4.  Plaintiff lived alone in a trailer home she owned, which was located on the property of Chester and Darlene Craig.  *See id.* at ¶ 3.  Plaintiff relied on Mr. and Mrs. Craig for much of her care, including transportation outside of her home, meals, and general assistance with the activities of daily life.

In the winter of 2009/2010, Mr. Craig received a catalogue from Defendant The Scooter Store Ltd. ("the Scooter Store"), advertising the "Go-Go Ultra X Scooter" in both a four-wheel and three-wheel model.  Because of her mobility issues, Plaintiff required a scooter to engage in activities such as going shopping with the Craigs.  Before the Go-Go Scooter, Plaintiff had bought for herself a "Caddy" three-wheeled scooter from QVC to ride around the neighborhood. *See id.* at ¶ 31.  The Caddy Scooter came with an owner's manual, which provided "Safety Instructions" about the "stability and slopes" on which the Caddy three-wheeled scooter could be safely operated.  *See id.* at ¶ 32.  There were several problems with the Caddy Scooter, however, so the Craigs decided to purchase Plaintiff a new scooter that they could use to take her shopping. *See id.* at ¶ 35.  The Craigs wanted to buy Plaintiff a "travel scooter" that could be easily taken apart, put in a car and put back together for use when shopping.  *See id.* at ¶ 37.

The Craigs reviewed both three and four-wheeled scooters and decided to purchase Plaintiff a three-wheeled scooter.  *See id.* at ¶ 38.  Although Plaintiff never spoke with anyone at the Scooter Store or Pride Mobility Products Corporation ("Pride Mobility") before Mr. Craig purchased the scooter, *see id.* at ¶ 41, Mr. Craig did explain to Plaintiff the differences between a three and four-wheel scooter, including that a three-wheel scooter is better for use in stores because it is capable of making tighter turns.  *See id.* at ¶ 42.

2

Eventually, Mr. Craig purchased the three-wheeled Go-Go Ultra X Scooter from the Scooter Store by telephone. *See id.* at ¶ 43. While purchasing the scooter for Plaintiff, Mr. Craig advised the Scooter Store's sales representative that Plaintiff was ninety-three years old, that she weighed about ninety-eight pounds, and that she would be using the scooter to "'get around'" and possibly to "'go shopping.'" *See id.* at ¶ 44. Mr. Craig did not tell the Scooter Store's sales representative about the terrain of his property or the driveway on which Plaintiff would be using the scooter, and the sales representative did not ask. *See id.* at ¶ 45; *see also* Dkt. No. 36 at ¶ 45. The catalog Mr. Craig received from the Scooter Store did not state anything about using the scooter on gravel or loose surfaces, and Mr. Craig did not ask if it could be used on such surfaces. *See* Dkt. No. 31-11 at ¶ 46. Plaintiff claims that although the Scooter Store made no oral warranties to Mr. Craig while he was on the telephone with its representative, warranties were made in Pride Mobility's literature and brochure. *See* Dkt. No. 36 at ¶ 48; *see also* Dkt. No. 31-11 at ¶ 48.

The Go-Go Scooter was delivered to the Craig's home in a large box and needed to be assembled. *See* Dkt. No. 31-11 at ¶ 49. According to Plaintiff, Mr. Craig's friend, Eugene Lowe, assisted in assembling the scooter. *See id.* at ¶ 55; Dkt. No. 36 at ¶ 55. The Owner's Manual for the scooter was located in a sealed plastic bag that also contained the scooter's keys and pins for the seat. *See id.* at ¶¶ 58-59. Neither Plaintiff nor Mr. Craig read the Owner's Manual prior to assembling and operating the scooter because they were unable to locate it at first. *See id.* at ¶ 62.

Once Mr. Craig and Mr. Lowe finished assembling the scooter, Mr. Craig test drove the scooter. *See id.* at ¶ 60. Mr. Craig is six-feet fall and weighs two-hundred and seventy-nine pounds. *See id.* at ¶ 61. While test driving the scooter, "he made a 'sharp turn,' turning the

handlebars from the 12:00 o'clock position to the 9:00 [o']clock position; he did not feel any instability in the scooter whatsoever." *See id.* (quotation omitted).

Once Mr. Craig was finished test driving the scooter, Plaintiff took the scooter for a ride around block, which lasted for approximately thirty minutes. *See id.* at ¶ 69. While Plaintiff drove the scooter around the block, she was followed by Mrs. Craig, who was riding a bicycle. *See id.* at ¶ 70. Mrs. Craig came back to the house before Plaintiff and, therefore, did not see the accident occur. *See id.* at ¶ 71.

According to Plaintiff, the accident occurred in front of her house. *See id.* at ¶ 72. While she was driving on the right side of the road, she felt an "'impact'" after "'hitting a stone or something'" and was "'thrown' from the scooter." *See id.* at ¶ 73 (quotation omitted). Upon being "'thrown'" from the scooter, Mr. and Mrs. Craig heard Plaintiff scream and found her approximately six inches from the back of Mr. Craig's car with the scooter on top of her. *See id.* at ¶¶ 74-76 (citations omitted). After calling 911, Mr. Craig went to Plaintiff and noted that the scooter was already picked up off of her and was placed between the driver's side and rear passenger side door of his car. *See id.* at ¶ 77 (citation omitted).

**B.    The Pride Go-Go Scooter**

The Go-Go Ultra X three-wheel scooter Mr. Craig purchased for Plaintiff is a Pride Mobility product. *See id.* at ¶ 12. The Go-Go Scooter is designed to the specifications of a Class-II Medical Device approved for use by the United States Food and Drug Administration ("FDA"). *See id.* at ¶ 13. The Go-Go Scooter has three wheels – two in the back and one in the front – a seat, and a tiller which is used to steer. *See id.* The Go-Go Scooter is also equipped with two additional anti-tip wheels in the back of the unit, and utilizes an electric motor and two, twenty-

4

four volt batteries. *See id.* The parties agree that the Go-Go Scooter "meets the standards set forth by ISO and the American National Standard Institute/Rehabilitation Engineering and Assistive Technology Society of North America ('ANSI/RESNA'), Requirements for Test Methods For Wheelchairs (including Scooters) with Electrical Systems,' which apply to Class-II Medical Device electrical scooters." *See id.* at ¶ 14.

Pride Mobility performs the certification testing at its facility in Pennsylvania and the Go-Go Scooter passed all of the dynamic and static stability tests under the ISO and ANSI/RESNA standards, as required by the FDA. *See id.* at ¶ 15. According to Defendants, "[a]s set forth in the testing documents, when Pride performs the testing of the GoGo Scooter, Pride puts the scooter in its worst possible configuration for each test, *i.e.*, a configuration which would make the scooter prone to tipping by putting it in its least stable condition." *See id.* at ¶ 16. In addition to the ISO and ANSI/RESNA testing, Pride Mobility also performs supplemental testing on its products on a specially designed test tract on which the Go-Go Scooters (and other Pride Mobility products) are tested on several obstacles and uneven surfaces, "including uneven pavers and bricks, curbs and ADA curb cut-outs, just to make sure that the product is as safe and stable as possible in real world driving conditions." *See id.* at ¶ 17.

The Go-Go Scooter is a "travel scooter" which is designed to be light-weight and easy to disassemble, put in a car and quickly reassembled for use. *See id.* at ¶ 18. The Go-Go Scooter "is designed to perform admirably on packed soil, grass and gravel. Nevertheless, the customer is warned and instructed to read the Owner's Manual before using the GoGo Scooter, as it provides important information about how to operate the scooter outdoors and how to avoid potential tipping hazards." *See id.* at ¶ 19.

### III. DISCUSSION

**A.**      **Defendants' motion to exclude Mr. Chen's testimony**

*1. Defendants' position*

Defendants argue that Plaintiff's proffered expert, Peter Chen, "must be excluded from testifying because not only is he unqualified to offer any opinions in this case, the opinions he offered are admittedly based on speculation, are untested and are just plain wrong." *See* Dkt. No. 31-10 at 6.[1]  Mr. Chen's report opines that the Go-Go Scooter tipped over when Plaintiff allegedly drove over a localized 6.9° lump in the driveway.  *See id.* at 7.  Defendants claim that, "[p]utting aside that the Pride GoGo Scooter is designed, tested and able to proceed over such a grade . . . , Mr. Chen admitted during his deposition that: i) he has no evidence to offer a jury that Ms. Monell actually drove her scooter over the lump . . . ; ii) he cannot offer any evidence to a reasonable degree of engineering certainty as to where Ms. Monell encountered the lump . . . ; and iii) Ms. Monell may not have even encountered the lump." *See id.* (internal citations omitted).  Therefore, Defendants assert that all of Mr. Chen's opinions regarding the "lump and its alleged interaction with the GoGo Scooter are unsupported conjecture." *See id.*

Moreover, Defendants argue that Mr. Chen did not measure the length, width, or height of the alleged lump, did not photograph the lump, and "admittedly has no information from which he can determine where the lump is located." *See id.* at 7-8.  Further, Defendants assert that Mr. Chen's opinion about the Go-Go Scooter's interaction with the alleged 6.9° lump is misleading because he failed to place any part of the scooter on the lump so that he could measure the angle of the scooter on the lump. *See id.* at 8.  Defendants continue by claiming that Mr. Chen never performed any testing of the scooter on or off of the lump, "and while he claims to have operated

---

[1] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

the scooter, that alleged fact is not disclosed in his expert report, and the Craigs actually denied

that Mr. Chen test drove the scooter."  *See id.*  Even assuming, *arguendo*, that Mr. Chen did drive

the scooter, Defendants argue that he failed to perform any "tip-testing of the scooter."  *See id.*

    Finally, Defendants argue that there is no basis for Mr. Chen's opinion that a cause of the

accident was the failure to provide adequate information and warnings about the Go-Go Scooter,

both pre and post sale.  Defendants claim that Mr. Chen has failed to offer an opinion as to what

additional warning or instructions should have been provided with the Go-Go Scooter, or whether

any additional warnings/instructions would have altered the behavior of the Craigs or Plaintiff.

*See id.* at 9.


### *2. Plaintiff's position*

    First, Plaintiff argues that Mr. Chen should be allowed to testify and directs the Court's

attention to a case it claims is factually similar in which the court denied the defendant's motion to

preclude the plaintiff's expert witnesses from testifying.  *See* Dkt. No. 34 at 8 (citing *Floyd v.

Pride Mobility Products Corp.*, 2007 WL 4404049 (S.D. Ohio 2007)).  Next, Plaintiff claims that

Mr. Chen is sufficiently qualified to be permitted to testify pursuant to Rule 702 of the Federal

Rules of Evidence.  *See id.* at 9-10.  Plaintiff asserts that Mr. Chen has extensive training and

education in mechanical engineering, and that "he possesses expertise in the areas of Mechanical

Engineering, machine Analysis and Guarding, Human Factor Analysis, Product Liability,

Analysis and Testing, Accident Reconstruction and Mechanical Equipment Evaluations."  *See

id.* at 9.  Moreover, Plaintiff argues that Mr. Chen is employed by an investigative engineering

company, which employs accident analysis experts who provide skilled forensic engineering to

determine the origin and cause of product failures and accidents, and that he has experience

investigating and testifying in at least three prior scooter cases. *See id.* Plaintiff claims that Defendants are mistaken in their assertion that Mr. Chen cannot offer an expert opinion in this case because he is not an expert in FDA regulations or an expert in the sale of mobility products. *See id.*

Next, Plaintiff argues that Mr. Chen's opinion that the Go-Go Scooter was defectively designed for use on outdoor surfaces, such as Plaintiff's driveway, is supported by sufficient evidence, testing and analysis to be admissible. *See id.* at 11. Plaintiff claims that "Mr. Chen did a thorough site inspection of the accident location, spoke to Mr. Craig, . . . inspected the scooter in question, measured the slope of the lump, compression tested and observed the surface of the driveway, measured the scooter, reviewed deposition testimony of witnesses, defendants' own materials and other relevant information." *See id.* Moreover, according to Plaintiff, Mr. Chen used generally accepted engineering principles of physics, lateral stability and the stability triangle to render an opinion as to how the accident at issue occurred and to identify the design defects of the Go-Go Scooter. *See id.*

Finally, Plaintiff argues that Mr. Chen's opinions are not "unsupported conjecture" and inconsistent with evidence. *See id.* To the extent that Defendants take fault with his use of methodologies or lack of authority for his opinion, Plaintiff asserts that such arguments go to the weight of the evidence, not the admissibility of his testimony. *See id.* at 12-13.

### 3. Analysis

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. That Rule provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in

> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form of
> an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In reviewing the admissibility of expert testimony, "the district court has a 'gatekeeping'

function under Rule 702 – it is charged with 'the task of ensuring that an expert's testimony both

rests on a reliable foundation and is relevant to the task at hand.'"  *Amorgianos v. Nat'l R.R.*

*Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786 (1993)).  The rule set forth in *Daubert*

applies to scientific knowledge, as well as technical or other specialized knowledge.  *See Kumho*

*Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

As the Second Circuit has explained,

> [i]n fulfilling this gatekeeping role, the trial court should look to the
> standards of Rule 401 in analyzing whether proffered expert
> testimony is relevant, *i.e.*, whether it has any tendency to make the
> existence of any fact that is of consequence to the determination of
> the action more probable or less probable than it would be without
> the evidence.  Next, the district court must determine whether the
> proffered testimony has a sufficiently reliable foundation to permit
> it to be considered.  In this inquiry, the district court should
> consider the indicia of reliability identified in Rule 702, namely, (1)
> that the testimony is grounded on sufficient facts or data; (2) that
> the testimony is the product of reliable principles and methods; and
> (3) that the witness has applied the principles and methods reliably
> to the facts of the case.  In short, the district court must make
> certain that an expert, whether basing testimony upon professional
> studies or personal experience, employs in the courtroom the same
> level of intellectual rigor that characterizes the practice of an expert
> in the relevant field.

*Amorgianos*, 303 F.3d at 265 (internal alterations, quotations, and citations omitted).  The court

must also consider the fact that "experience in conjunction with other knowledge, skill, training or

education . . . [may] provide a sufficient foundation for expert testimony," and "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702; *see also Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience").

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266 (citation omitted). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Id.* "'The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions.'" *Id.* (quotation and other citation omitted).

As the courts and Advisory Committee have made clear, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's Note; *see also E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F. Supp. 2d 213, 226 (S.D.N.Y. 2004). "This principle is based on the recognition that 'our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.'" *Melini*, 2009 WL 413608, at *5 (quoting *Amorgianos*, 303 F.3d at 267).

However, "when an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266; accord *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005).[2]  Furthermore, "it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267.  Of course, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* at 266 (citing *Daubert*, 509 U.S. at 595).  Nevertheless, "conclusions and methodology are not entirely distinct from one another."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Accordingly, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Joiner*, 522 U.S. at 146.

In the present matter, contrary to Defendants' assertions, a review of Mr. Chen's affidavit, as well as his report and supplemental report, make clear that Mr. Chen's opinions and testimony are sufficiently reliable and based on sufficient facts and data to permit him to testify at trial. According to Mr. Chen, in reaching his conclusions, he visited and inspected the site of the accident, reviewed deposition transcripts of the involved individuals, and operated the Go-Go

---

[2] *See also Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358-60 (2d Cir. 2004) (holding that expert testimony that was speculative and unreliable was properly not considered by the district court on summary judgment); *Dreyer v. Ryder Auto. Carrier Group, Inc.*, 367 F. Supp. 2d 413, 416-17 (W.D.N.Y. 2005) (noting that "[a]n otherwise well-credentialed expert's opinion may be subject to disqualification if he fails to employ investigative techniques or cannot explain the technical basis for his opinion"); *Dora Homes, Inc. v. Epperson*, 344 F. Supp. 2d 875, 887-89 (E.D.N.Y. 2004) (declining to consider plaintiff's expert's testimony in deciding pending motions for summary judgment based on a finding that the expert's testimony "is unreliable under Fed. R. Evid. 702 and the principles articulated in *Daubert* and its progeny," given that the expert (1) qualified his opinions, (2) failed to support his opinions with any methodology which the court could analyze, and (3) rested his opinions "upon nothing more than subjective belief and unsupported speculation").

Scooter in the driveway where the accident is alleged to have occurred.  *See* Dkt. No. 35-1.

Moreover, Mr. Chen inspected and analyzed the lump that is alleged to have caused the accident

and determined that if the rear wheel of the scooter went over the lump, it would have created a

sufficient angle to cause the scooter to tip.  *See id.* at ¶ 8.  Further, Mr. Chen explains that,

although he tested the scooter, he did not attempt to recreate the accident because it would have

caused risk of injury to himself and because it would have been "near impossible to recreate the

exact conditions which caused the scooter to tip, that is, the weight of Ms. Monell; her position

sitting on the scooter; and the exact manner the rear wheel hit the lump and the location of the

front wheel, which caused the lateral instability and the tipping over."  *See id.*

In his affidavit, Mr. Chen provides the following regarding the investigation he conducted,

the methods he employed, and the conclusions he reached:

> 9.  I do not need to know the angle of the Go-Go scooter when it encountered the lump or the different variables or how it may have encountered the lump, because the accident speaks for itself.  It is my opinion, based upon a reasonable degree of engineering certainty, that the only plausible explanation for the scooter tipping over was the rear wheel of the scooter encountering that 6.9° lump, upsetting the stability triangle or the lateral stability, and throwing Ms. Monell to the ground.  The only evidence that I have is the happening of the accident; my observations and measurements of the lump in the area where Ms. Monell was found; my review of the defendants' testing and deposition testimony of their representative, Michael Zablocky, and defendants' dynamic lateral stability testing which indicates the scooter will tip at 5.75°.
>
> 10.  I have reviewed the applicable standards, ANSI/RENSA and ISO, and they do not include, nor did the testing performed by defendants' experts include, testing at the angle of least stability, that is putting the front wheel and one of the rear wheels perpendicular to the ramp incline, the condition encountered in this accident by Ms. Monell.

11.     I have reviewed the Winter 2009/2010 catalogue which Mr. Craig received and from which he subsequently ordered a scooter for Ms. Monell. . . .  The catalogue advertises both the 3-wheel and 4-wheel model Go-Go Ultra X scooters on the same page and makes no distinction between the two. . . .  The catalogue also states that when a consumer calls, a "Product Consultant will ask about your needs to help you find a scooter that's a perfect fit." . . .  The catalogue makes no reference to the difference in stability between the Go-Go Ultra X 3-wheel model and 4-wheel model.  The catalogue also details their superior customer service in assisting customers in choosing the correct and safest scooter and names their product consultants experts in scooters. . . .  In addition, as referenced in my report, when I visited the Pride Mobility website, there is nothing that discussed lateral stability, or compared stability between the Go-Go Ultra X 3-wheel model and 4-wheel model, or other scooter models.  The website also advertised the Go-Go Ultra X as an indoor/outdoor scooter. . . .

* * * * *

14.     It is my opinion, within a reasonable degree of engineering certainty, that a substantial cause of Ms. Monell's accident was the raised lump in the driveway adjacent to the tree, that was difficult to see because the driveway and adjacent areas are comprised of hard compacted soil and rock, causing the scooter to tip.  The scooter was advertised as a scooter that could be used on outdoor surfaces.  The fact that this accident happened represents an improper design and a failure to provide adequate warnings regarding the lateral stability and appropriate use of the scooter.

15.     The product was therefore not fit for the ordinary purpose for which defendants claim it could be used; that is, as an outdoor scooter.  The design was improper because it could not withstand the driveway deviation (the lump) in this case, which was well within its intended purpose.  Further, the design was improper with respect to warning that should have been posted directly on the scooter, warnings of limitations in its lateral stability.

16.     An alternative design that would have prevented this incident is a 4-wheel scooter, that would have offered the lateral stability necessary, given the factors present in this case.

13

\* \* \* \* \*

18.    It is my opinion, within a reasonable degree of engineering certainty, that a substantial cause of the subject accident was a lack of warning labels with regard to lateral stability, or stability of a 3-wheel versus 4-wheel scooter, necessary for a consumer, like Ms. Monell and/or her agents, to make informed safety decisions. The warnings are inadequate to property advise a person of the dangers of lateral stability on a 3-wheeled scooter. That defendants provided no limits, guidelines or inspection criteria for users to follow regarding surfaces and lateral stability or position of least stability. An appropriate warning would have been, not to operate it on packed soil, grass and gravel because you may encounter "lumps", such as Ms. Monell did in the current case.

*See id.* at ¶¶ 9-11, 14-16 & 18 (citations omitted).

Mr. Chen's report goes on to discuss, in more detail, the testing that he performed, as well as testing performed by Defendant Pride Mobility, on this three-wheeled scooter. *See* Dkt. No. 35-3 at 9-11. Mr. Chen concludes that Defendant Pride Mobility did not test the stability of this scooter "per the ANSI/RESNA standard or company specific standards that mimicked this kind of lump," which caused the scooter to be placed in the "angle of least stability (putting the front wheel and one of the rear wheels perpendicular to the ramp incline)." *See id.* at 10.

While many of Defendants' contentions are sensible, they simply go to the weight of Plaintiff's expert's testimony and do not provide a basis for exclusion. *See Demar v. D.L. Peterson Trust*, No. 1:05-cv-103, 2006 WL 2987314, \*5 (N.D.N.Y. Oct. 13, 2006). It is clear that Mr. Chen's initial report, supplemental report, and affidavit rest on a sufficiently reliable foundation and are relevant to the issues presented. *See Amorgianos*, 303 F.3d at 265 (citation omitted); *see also Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) (holding that the Supreme Court in *Daubert* "expressed its faith in the power of the adversary system to test 'shaky but admissible' evidence, . . . and advanced a bias in favor of admitting evidence short of that solidly

14

and indisputably proven to be reliable" (quotation omitted)).  Finally, the Court finds no valid

basis for Defendants' argument that since Mr. Chen "is not an expert in FDA regulations, nor an

expert in the sale of mobility products," his testimony must be excluded.  *See Floyd v. Pride*

*Mobility Products Corp.*, No. 1:05-CV-389, 2007 WL 4404049, *5 (S.D. Ohio Dec. 12, 2007)

(holding that the plaintiffs' experts, who held degrees in electrical engineering, mechanical and

human factors engineering, were qualified to testify as experts despite their "lack of experience in

the 'scooter industry'"); *Santoro v. Donnelly*, 340 F. Supp. 2d 464, 473 (S.D.N.Y. 2004) (holding

that "[t]he question is not whether the engineer is an expert on the exact issues presented in the

case, but rather, whether his general engineering experience qualifies him to testify in an area in

which he does not have extensive experience").  Mr. Chen's credentials clearly demonstrate that

he is sufficiently qualified to testify as an expert in this case, in the manner proposed.

Based on the foregoing, the Court finds that Mr. Chen's opinions are based on sufficient

data related to the scooter and accident in question, and are sufficiently grounded in his

engineering discipline so as to justify their admission.  As such, the Court denies Defendants'

motion to exclude the testimony of Plaintiff's expert witness.


**B.**      **Defendants' motion for summary judgment**

   *1. Standard of review*

A court may grant a motion for summary judgment only if it determines that there is no

genuine issue of material fact to be tried and that the facts as to which there is no such issue

warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43

F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the

court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'"  *Id.* at

36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted).  Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions.  *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

### 2. Products liability

"In New York, a plaintiff injured by an allegedly defective product may seek recovery against the manufacturer on the basis of any one or more of four theories of liability," including contract (express or implied), negligence, or strict products liability.  *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106 (1983) (citing *Victorson v. Bock Laundry Mach. Co.*, 37 N.Y.2d 395, 373 N.Y.S.2d 39, 335 N.E.2d 275, 276-77 (1975)).  Although the available defenses and applicable limitations principles of the various liability theories differ, there can be "a high degree of overlap between the substantive aspects" of the causes of action.  *Denny v. Ford Motor Corp.*, 87 N.Y.2d 248, 256 (1995) (citation omitted).

16

### a. Strict products liability

Established New York law holds "that 'the manufacturer of a defective product is liable to any person injured or damaged if the defect was a substantial factor in bringing about his injury or damages; provided (1) that at the time of the occurrence the product is being used . . . for the purpose and in the manner normally intended, (2) that if the person injured or damaged is himself the user of the product he would not by the exercise of reasonable care have both discovered the defect and perceived its danger, and (3) that by the exercise of reasonable care the person injured or damaged would not otherwise have averted his injury or damages.'" *Voss*, 59 N.Y.2d at 106 (quoting *Codling v. Paglia*, 32 N.Y.2d 330, 342, 345 N.Y.S.2d 461, 298 N.E.2d 622, 628-29 (1973)). A manufacturer may be liable under strict products liability for defective products based on a "manufacturing flaw, improper design or failure to warn." *Sukljian v. Charles Ross & Son Co., Inc.*, 69 N.Y.2d 89, 94 (1986) (citations omitted). Specifically, under strict products liability, a manufacturer which places a defective product on the market is liable for injury resulting from using the product for its intended or reasonably foreseeable purposes. *See Denny*, 87 N.Y.2d 248, 258-59 (1995). In the present matter, Plaintiff alleges strict products liability claims of defective design and failure to warn.

### i. Defective design

Defendants argue that, even if Mr. Chen is allowed to testify, Plaintiff has still failed to establish that a design defect proximately caused the incident at issue. *See* Dkt. No. 31-10 at 13. Defendants argue that Mr. Chen acknowledges that the three-wheel scooters provide superior mobility and handling in the mall environment in which Plaintiff was intending to use the scooter

and that it "was reasonably safe for the intended use as a travel scooter, except for in the specific driveway at the Monell residence." *See id.* (citing Exh. U, p. 265-267).  Further, Defendants claim that Plaintiff fail to meet the second prong of this claim because Mr. Chen did not opine that it was feasible to design the Go-Go Scooter in a safer manner or that any proposed design change would have prevented Plaintiff's injuries.  *See id.* at 10.

To establish a *prima facie* case in strict products liability based on design defect, "'the plaintiff must show that the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury.'"  *Adams v. Genie Industries, Inc.*, 14 N.Y.3d 535, 542 (2010) (quotation omitted).[3]  Whether a product "is not reasonably safe" has been described as follows: "'whether . . . if the design defect were known at the time of the manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner.'"  *Id.* (quotation omitted).  Therefore, to succeed on her claim, Plaintiff must establish that (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing her injury.  *See Voss*, 59 N.Y.2d at 108 (citation omitted).

A finding of such liability requires the jury to balance the risks of using the product in its present condition against the product's risks and costs, and against the risks, usefulness and costs

---

[3] "In design defect cases, the alleged product flaw arises from an intentional decision by the manufacturer to configure the product in a particular way.  In contrast, in strict products liability cases involving manufacturing defects, the harm arises from the product's failure to perform in the intended manner due to some flaw in the fabrication process.  In the latter class of cases, the flaw alone is a sufficient basis to hold the manufacturer liable without regard to fault." *Denny*, 87 N.Y.2d at 257 n.3 (citation omitted).

of using the alternative design instead of the one creating the alleged defect. *See Denny*, 87

N.Y.2d at 257 (citation omitted). In balancing the inherent risks of a product as designed, against

its utility and cost, the following factors may be considered:

> (1) the utility of the product to the public as a whole and to the
> individual user; (2) the nature of the product – that is, the likelihood
> that it will cause injury; (3) the availability of a safer design; (4) the
> potential for designing and manufacturing the product so that it is
> safer but remains functional and reasonably priced; (5) the ability of
> the plaintiff to have avoided injury by careful use of the product; (6)
> the degree of awareness of the potential danger of the product
> which reasonably can be attributed to the plaintiff; and (7) the
> manufacturer's ability to spread any cost related to improving the
> safety of the design.

*Voss*, 59 N.Y.2d at 109 (citations omitted).

In the present matter, contrary to Defendants' assertions, Plaintiff has created questions of

fact as to this claim that preclude summary judgment. Specifically, Mr. Chen stated in his report

that a cause of Plaintiff's accident was the fact that she chose the Go-Go Ultra X three-wheeled

scooter, as opposed to other available models, because this version did not provide sufficient

lateral stability in certain situations. *See* Dkt. No. 35-3 at 10-11. Further, Mr. Chen stated that,

unlike Plaintiff's previous "legacy scooter," which had a thirty-six (36) inch wheel base and a

twenty-four (24) inch track, the Go-Go Ultra X scooter had only a twenty-eight (28) inch wheel

base and an eighteen (18) inch track width. *See id.* at 10. Therefore, Plaintiff may not have been

aware of an increased likelihood that her new scooter would tip in certain conditions. Mr. Chen

further states that a four-wheel scooter would have provided more stability and may have

prevented this injury. *See id.* at 11. Moreover, in his deposition, Mr. Chen again stated that a

four-wheeled scooter would have provided more stability and that the four-wheeled version

would of served the intended purpose, *i.e.*, a travel scooter that can be easily transported. *See*

Dkt. No. 30-9 at 248-51. Although a four-wheeled scooter could still possibly tip, Mr. Chen

made clear that such an incident was less likely because of the greater stability provided by the four-wheel model. *See id.* at 251-52.

Additionally, the fact that Defendants have presented conflicting expert testimony that the Go-Go scooter was safe as designed creates questions of fact and credibility determinations to be answered by the jury. *See Wojcik v. Empire Forklift, Inc.*, 14 A.D.3d 63, 65 (3d Dep't 2004) (citation omitted). Although Defendants criticize Plaintiff and Mr. Chen for failing to "opine that it was feasible to design the GoGo Scooter in a safer manner," his opinion that the four-wheel version of the scooter was safer, suitable for the intended purpose, and that it may have prevented the injury is sufficient to withstand Defendants' motion. *See Humphrey v. Diamant Boart, Inc.*, 556 F. Supp. 2d 167, 178 (E.D.N.Y. 2008) (holding that the plaintiff's expert did not need to test his theory of alternative feasible design because "such testing is not required to establish feasibility if the expert can point to an existing design in the marketplace" (citation omitted)); *see also Bah v. Nordson Corp.*, No. 00 CIV 9060, 2005 WL 1813023, *8 (S.D.N.Y. Aug. 1, 2005) (citations omitted).

Based on the foregoing, the Court denies Defendants' motion for summary judgment as to Plaintiff's design defect claim.

### ii. Failure to warn

Plaintiff also seeks to hold Defendants liable under negligence and strict liability for their failure to provide adequate warnings. Defendants argue that Plaintiff did not read the Owner's Manual that accompanied the Go-Go Scooter or the marketing literature about the product, and she never spoke with anyone from Pride Mobility or the Scooter Store; and, therefore, there is no basis for any claim that the incident was proximately caused by the failure to provide adequate

warnings.  *See* Dkt. No. 31-10 at 15.  Moreover, Defendants claim that Mr. Chen admits that Mr. Craig and Plaintiff should have followed the warnings provided with and on the scooter.  *See id.*  Finally, Plaintiff argues that Plaintiff has not offered any proposed alternative warning(s) which would have prevented the incident.  *See id.*

Under New York law, "[a] manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known."  *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237 (1998) (citing *Rastelli v. Goodyear Tire & Rubber Co.*, 79 N.Y.2d 289, 297, 591 N.E.2d 222, 582 N.Y.S.2d 373 (1992)).  A plaintiff must show a breach of that duty and "that the failure to warn was the proximate cause of his [or her] injury."  *Henry v. Rehab Plus Inc.*, 404 F. Supp. 2d 435, 442 (E.D.N.Y. 2005) (citations omitted); *see also Howard v. Poseidon Pools, Inc.*, 72 N.Y.2d 972, 974 (1988).  Thus, to make out a *prima facie* case in negligence and strict liability, a plaintiff asserting a failure to warn claim must establish that (1) the manufacturer had a duty to warn, *i.e.*, it knew or should have known of latent dangers resulting from intended or reasonably foreseeable unintended uses of the product; (2) the plaintiff used the product in a reasonably foreseeable manner; and (3) the manufacturer's failure to provide a warning was the cause of the plaintiff's harm.  *See Santoro ex rel. Santoro v. Donnelly*, 340 F. Supp. 2d 464, 485-86 (S.D.N.Y. 2004) (citation omitted); *see also Liriano*, 92 N.Y.2d at 237 (citations omitted).

"In New York, there is a presumption that a user would have heeded warnings if they had been provided and that the injury would not have occurred."  *Henry v. Rehab Plus Inc.*, 404 F. Supp. 2d 435, 442 (E.D.N.Y. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  Moreover, "[a] defense to liability for failure to warn exists when the injured party had actual knowledge of the danger."  *Id.* (citations omitted).

It is well-settled that a manufacturer has a duty to warn (1) "against latent dangers resulting from foreseeable uses of its product of which it knew or should have known," and (2) "of the danger of unintended uses of a product provided these uses are reasonably foreseeable." *Liriano v. Hobart Corp. ("Liriano I")*, 92 N.Y.2d 232, 237 (1998).  "Under New York law, the jury does not need expert testimony to find a warning inadequate, but may use its own judgment concerning all the circumstances."  *Billiar v. Minn. Mining and Mfg. Co.*, 623 F.2d 240, 247 (2d Cir. 1980) (citing *Rainbow v. Albert Elia Bldg. Co.*, 49 A.D.2d 250, 373 N.Y.S.2d 928, 931 (N.Y. App. Div. 1975) ("[R]ecovery [under a failure to warn theory] ultimately depends upon a subjective determination by the trier of the facts of what constitutes reasonable warning under all the circumstances") and *Young v. Elmira Transit Mix, Inc.*, 52 A.D.2d 202, 383 N.Y.S.2d 729, 731 (N.Y. App. Div. 1976)).  Moreover, the New York State Court of Appeals has described the standard for evaluating "failure-to-warn" liability as "intensely fact-specific, including but not limited to such issues as feasibility and difficulty of issuing warnings in the circumstances; obviousness of the risk from actual use of the product; knowledge of the particular product user; and proximate cause."  *Liriano I*, 92 N.Y.2d at 243.  Given this fact-intensive inquiry, as the Second Circuit has emphasized, "[t]he adequacy of the instruction or warning is generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of summary judgment."  *Urena v. Biro Mfg. Co.*, 114 F.3d 359, 366 (2d Cir. 1997) (citing *Beyrle v. Finneron*, 199 A.D.2d 1022, 606 N.Y.S.2d 465, 466 (N.Y. App. Div. 1997)); *see also Liriano v. Hobart Corp. ("Liriano II")*, 132 F.3d 124, 131 (2d Cir. 1998) (stating that the courts have "squarely h[e]ld that it is up to the jury to decide whether the manufacturer, in fact, has a duty to warn" (citations omitted)).

There are certain circumstances, however, where failure to warn claims can be decided as

a matter of law: (1) "where the injured party was fully aware of the hazard through general knowledge, observation or common sense, or participated in the removal of the safety device whose purpose is obvious"; or (2) where the hazards are "patently dangerous or pose open and obvious risks." *Liriano I*, 92 N.Y.2d at 241.

In the present matter, contrary to Defendants' arguments, Plaintiff has put forth sufficient, admissible evidence to create questions of fact to defeat the pending motion for summary judgment.  In his affidavit, Mr. Chen opined that this accident could have been avoided had Defendants provided adequate warnings in the marketing material and on the scooter itself informing their customers about "lateral stability and appropriate use of the scooter."  *See* Dkt. No. 35-1 at ¶¶ 14-15.  Mr. Chen specifically states that not only was the warning itself materially inadequate, but that the location of the warning was insufficient as well.  *See id.* at ¶ 15. According to Mr. Chen, a warning should have been placed on the scooter itself warning Plaintiff about the potential that the scooter may tip when used in a certain manner.  *See id.*  Finally, Mr. Chen states that "[D]efendants provided inadequate information to the [P]laintiff and other end users, with regard to the product's lateral stability or stability in positions of least stability, in order for the customer, like [P]laintiff, to make an informed decision about whether this scooter was the proper one to purchase."  *See id.* at ¶ 17.

Moreover, the fact that neither Plaintiff nor Mr. Craig read the Owner's Manual or the other material that came with the scooter is not dispositive under New York law in connection with a failure to warn claim.  *See Humphrey*, 556 F. Supp. 2d at 180-81.  "First, a plaintiff may be able to argue that the warnings, in addition to being substantively inadequate, were insufficiently conspicuous or prominent and, thus, be able to overcome his or her failure to read them."  *Id.* at 181 (citations omitted); *see also Derienzo v. Trek Bicycle Corp.*, 376 F. Supp. 2d 537, 568

(S.D.N.Y. 2005) ("While it is true that, in many cases, a plaintiff who admits that he failed to read a warning that was issued with the product will have failed to show that any deficiency in that warning was the proximate cause of his injuries, plaintiff's failure to read an insufficiently conspicuous or prominent warning will not necessarily defeat the causation element of a failure to warn claim" (citations omitted)); *Anderson v. Hedstrom Corp.*, 76 F. Supp. 2d 422, 443 (S.D.N.Y. 1999) ("[T]he location and conspicuousness of the warnings (whether that be based on label or letter size, color, or other attributes of conspicuousness), and the role those factors played in the plaintiff's failure to read them, as well as the content and clarity of those warnings, are disputed issues in this case, and the plaintiff's failure to read the warnings should not, in and of itself, prevent the 'failure to warn' claim from going before the jury" (citations omitted)); *German v. Morales*, 24 A.D.3d 246, 247 (1st Dep't 2005) ("A jury could reasonably conclude, on the basis of the warnings that the expert asserts should have been included on the label, that the warnings that were included were inadequate and inconspicuous.  Under such circumstances, a manufacturer who provides insufficient warnings cannot avoid liability solely because the plaintiff did not read the warnings that were provided" (citation omitted)).

"Second, a plaintiff also may be able to prevail under New York law with respect to his failure to warn claim, even though it is undisputed that he failed to read the warnings, if he can demonstrate that adequate warnings would have come to the attention of a third party, such as fellow workers or an employer, and they would have informed him of those warnings." *Humphrey*, 556 F. Supp. 2d at 181-82 (citations omitted).

In the present matter, as discussed above, Plaintiff, through her expert, has cited to alleged inadequacies in the substance of the warnings that were provided and to their conspicuousness, including the failure to include such a warning in the marketing material and on the scooter itself.

In short, these factual issues as they relate to the conspicuousness and substance of the warnings, and whether Mr. or Mrs. Craig would have conveyed to Plaintiff any warnings had they been more conspicuously placed preclude granting Defendants' motion for summary judgment.

Based on the foregoing, the Court denies Defendants' motion for summary judgment as to this claim.

### b. Negligence

Defendants claim that "New York courts generally consider strict products liability and negligence claims to be 'functionally synonymous.'" *See* Dkt. No. 31-10 at 15 (quotation and other citation omitted).  As such, Defendants argue that, since they are entitled to summary judgment with respect to Plaintiff's strict liability claims, they are also entitled to summary judgment with regard to Plaintiff's negligence claims.  *See id.* at 16.

Although Plaintiff asserts her design defect claim under theories of strict products liability and negligence, the same *prima facie* case is required under both theories.  *See Jarvis v. Ford Motor Co.*, 283 F.3d 33, 62-63 (2d Cir. 2002) (citing *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 639 N.Y.S.2d 250, 662 N.E.2d 730, 735 (1995)) ("In general, . . . the strict liability concept of 'defective design' is functionally synonymous with the earlier negligence concept of unreasonable designing" (internal citation omitted)).  In particular, the decisive question for both strict liability and negligent design causes of action is whether the evidence establishes that the product "was 'not reasonably safe' as *Voss* defines the term." *Adams v. Genie Industries, Inc.*, 14 N.Y.3d 535, 543 (2010).  Moreover, it is well-settled law that "'[w]here liability is predicated on a failure to warn, New York views negligence and strict liability claims as equivalent.'" *Estrada v. Berkel Inc.*, 14 A.D.3d 529, 530 (2d Dep't 2005) (quotation omitted).

Since the Court has denied Defendants' motion for summary judgment as to Plaintiff's

strict liability claims, Defendants' arguments as to Plaintiff's negligence claims must also fail.  As

such, the Court denies Defendants' motion seeking dismissal of Plaintiff's negligence claims.

### c. Breach of implied warranties of merchantability and fitness for a particular purpose

Defendants argue that the Court must dismiss Plaintiff's breach of warranty claims

because they are "co-extensive with their tort based claims[.]"  *See* Dkt. No. 31-10 at 16 (citations

omitted).

Causes of action for breach of implied warranties bear a strong resemblance to those for

strict products liability.  Under a theory of breach of implied warranty of merchantability or

breach of implied warranty of fitness for a particular purpose, the inquiry is focused on consumer

expectations when the product "was being used for the purpose and in the manner intended."

*Beneway v. Superwinch, Inc.*, 216 F. Supp. 2d 24, 30 (N.D.N.Y. 2002) (citation omitted).  "A

product must be 'fit for the ordinary purposes for which such goods are used' to be considered

merchantable under New York's version of the Uniform Commercial Code."  *Derienzo v. Trek

Bicycle Corp.*, 376 F. Supp. 2d 537, 570 (S.D.N.Y. 2005) (quotation and other citation omitted).

As the New York State Court of Appeals has made clear, it is not true as a matter of law

that all breach of implied warranty claims are duplicative of their more modern strict products

liability cousins.  *See Denny*, 87 N.Y.2d at 256.  An implied warranty claim asks only whether the

product was fit for its intended purpose, while the strict liability claim requires a risk-utility

balancing test which takes into account the utility of the product, the feasibility of an alternative

design and the risk of injury.  *See Donald v. Shinn Fu Co. of Am.*, No. 99-CV-6397, 2002 WL

32068351, *4 (E.D.N.Y. Sept. 4, 2002) (citation omitted).  A finding that a products liability

claim and a breach of implied warranty claim are distinct "requires a showing that the 'ordinary purpose' for which the product was sold and marketed is not the same as the purpose that provides the utility that outweighs the risk of injury." *Gonzalez by Gonzalez v. Morflo Indust., Inc.*, 931 F. Supp. 159, 167 (E.D.N.Y. 1996) (quotation omitted). Thus,

> [i]n some cases, a rational factfinder could conclude that a design defect that is not actionable in tort may nevertheless support a viable contract claim [*i.e.*, a breach of implied warranty claim]. That is, the factfinder could simultaneously conclude that a product's utility outweighs the risk of injury and that the product was not safe for the "ordinary purpose" for which it was marketed and sold.

*Id.* (citing *Denny*, 87 N.Y.2d at 263, 639 N.Y.S.2d at 258, 662 N.E.2d at 735).

For example, in *Denny*, a tort suit concerning a Ford Bronco, the New York State Court of Appeals concluded that a jury could rationally find that the vehicle's use as an off-road vehicle outweighed the risk of injury from "rollovers," but that the vehicle was not safe for its "ordinary purpose" of road driving. *See Denny*, 87 N.Y.2d at 263. Similarly, in *Donald*, a case concerning the safety of a jack used to raise forklifts so that repairs could be completed on their undersides, the court concluded that a reasonable jury could find that the "jack's 'ordinary purpose' as marketed is to hold in place fork lifts while repairs are made, while defendants could show that the utility of having a product that elevates (but doesn't hold in place) a fork lift outweighs the risk that it could collapse while being jacked up." *Donald*, 2002 WL 32068351 at *5.

In the present matter, Defendants have simply asserted that Plaintiff's product liability and breach of implied warranty claims are "co-extensive" and should therefore be dismissed. By simply asserting that the claims are redundant with no more detailed argument, Defendants have not demonstrated that they are entitled to summary judgment on this claim. *See Henry v. Rehab Plus Inc.*, 404 F. Supp. 2d 435, 444 (E.D.N.Y. 2005). Drawing all reasonable inferences from the

27

record in Plaintiff's favor, Plaintiff could demonstrate, for example, that the scooter's "ordinary purpose" was as a travel scooter, which would foreseeably be used for periods of time outdoors to achieve that purpose, which it is not fit to do.  Defendants, however, could demonstrate that the utility of having a three-wheeled scooter which is lighter and has a greater turning radius outweighed the risk that, in certain situations, the scooter might tip.  *See id.*

Accordingly, Defendants have failed to establish that Plaintiff's breach of implied warranty claims are identical to her strict products liability claims; and, therefore, Defendants' motion for summary judgment as to Plaintiff's breach of implied warranty claims is denied.[4]


# IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion to exclude Plaintiff's expert is **DENIED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED in part and**

---

[4] In its motion for summary judgment, Defendants argue that Plaintiff's breach of an express warranty claim must be dismissed because Defendants never made any express warranties regarding the scooter that induced Plaintiff to make the purchase.  *See* Dkt. No. 31-10 at 16-17.  In her response to the motion, Plaintiff does not address Defendants' contention that her claim for breach of express warranties must be dismissed.  *See* Dkt. No. 34 at 21-23.  In light of Plaintiff's failure to respond to Defendants' argument that her breach of express warranty claims must be dismissed, the Court finds that Plaintiff has abandoned these claims.  *See Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) (holding that "[f]ederal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way" (citation omitted)).  Accordingly, the Court grants Defendants motion for summary judgment as to Plaintiff's breach of express warranty claims.

**DENIED in part**; and the Court further[5]

      **ORDERS** that Defendants' counsel shall initiate a telephone conference, using a professional conferencing service, with the Court and Plaintiff's counsel on **Tuesday, October 2, 2012, at 11:00 a.m.**, to discuss a schedule for the trial of this matter; and the Court further

      **ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 14, 2012
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[5] Defendants' motion for summary judgment is only granted as to Plaintiff's breach of express warranty claims.